IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


KATHLEEN KUHL,

    Plaintiff,

vs.                                                                        CASE NO. 1:09-cv-205-MP-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security

    Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for disability insurance benefits ("DIB"), and supplemental security income benefits ("SSI"). (Doc. 1). The Commissioner has answered (Doc. 8), and both parties have filed briefs outlining their respective positions. (Docs. 12 and 17.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

On July 24, 2006, Plaintiff filed an application for disability insurance benefits and supplemental security income, alleging a disability onset date of May 1, 2006. (R. 90-95.) Plaintiff's application was denied initially on September 29, 2006 and upon reconsideration on February 2, 2007. (R. 34-47, 49-53.) Thereafter, Plaintiff timely

1

pursued her administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ") on March 15, 2007. (R. 57.) The ALJ conducted Plaintiff's administrative hearing on September 5, 2008. (R. 8, 16-33.) The ALJ issued a decision unfavorable to Plaintiff on November 17, 2008. (R. 8-15.) Plaintiff's request for review of the hearing decision by the Appeals Council was denied on July 31, 2009. (R. 1-4.) Plaintiff then appealed to this Court. (Doc. 1.)

## II. **STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4]

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, he is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is

---

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

3

disabled.[11]  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[12]  Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15]  The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of

---

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

4

exertion."[17]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III.  SUMMARY OF THE RECORD

#### A.  Personal Background

Plaintiff was 48 years old at the time of the administrative hearing and decision. (R. 20.)  She has completed high school.  (R. 20.)  The Plaintiff has not engaged in substantial gainful work activity during the period from her alleged disability onset date of May 1, 2006.  (R. 10.)

#### B. Mental Impairments

In June and July 2000, Plaintiff visited the Emergency Room at North Florida

---

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] *See id.*

5

Regional Medical Center in Gainesville, Florida several times complaining of pain from a recent shoulder injury. (R. 164-67.) The progress notes from those visits show that Plaintiff also reported not sleeping for three days and that Plaintiff appeared depressed and very tearful. (R. 164.) The differential diagnosis was somatization disorder. (R. 164.)

On September 15, 2006 Dr. Robert Greenberg examined Plaintiff for complaints of lower back pain. (R. 171-74.) Dr. Greenberg's diagnosis was possible osteoarthritis of the lumbar spine and left shoulder as well as severe hypertension. Dr. Greenberg's progress notes disclose that Plaintiff had decreased range of motion in the lumbar spine and pain in the left shoulder on palpation. (R. 174.) Dr. Greenberg's progress notes do not, however, contain any mention regarding depression or any mental health symptoms. Instead the notes reflect that Plaintiff only complained to Dr. Greenberg of problems and pain regarding her lumbar spine and left shoulder. (R. 171-74.) Dr. Greenberg also completed a Clinical Assessment of Pain by Consulting Physician form dated August 25, 2008 in which he reported that Plaintiff had chronic pain syndrome as well as marked restrictions in her ability to complete a normal workday and workweek without interruption from pain and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 219-24.) Notably, Dr. Greenberg checked "No" in response to a question that asked whether Plaintiff suffered from depression or anxiety related to her pain and checked "No" to a question that asked whether Plaintiff was being medicated for depression or anxiety. (R. 221.)

As part of the benefits application process, several Psychiatric Review Technique assessments ("PRT") were completed, one in September 2006 by Dr.

Steven Wise, Psy.D. and another in January 2007 by Dr. Alan Harris, Ph.D. (R. 183, 197.) The PRT completed by Dr. Wise noted that Plaintiff had not made any allegations in her benefits application concerning mental issues. (R. 195.) Dr. Wise concluded that Plaintiff did not demonstrate any medically determinable impairment or mental deficits and that there was "no evidence of mental illness of longitudinal or acute significance." (R. 183, 195.) Dr. Harris similarly noted in his PRT report that there was no evidence of mental disability or treatment, other than a single prescription for Valium a number of years before. Consequently, Dr. Harris and concluded that no medically determinable impairment was present. (R. 209.)

Plaintiff visited the ACORN Clinic in Gainesville, Florida for treatment of her depression from December 2006 through June 2008. (R. 225-51.) Plaintiff's initial evaluation at the clinic was performed on December 18, 2006. (R. 237.) Plaintiff reported during that visit that she was suffering from depression and headaches, that she was frequently upset, and that she lived alone and had very little social contact. (R. 237.) The progress notes from that visit disclose that Plaintiff had abnormalities in the area of emotional/mental/behavior and that Plaintiff appeared depressed. (R. 238.) The diagnosis was "depression, smoker, and shoulder and back pain. Plaintiff was referred to the clinic's psychiatric nurse for therapy. (R. 238.) Plaintiff visited the clinic again on January 17, 2007 and reported feeling quite anxious and depressed. Physical examination revealed "no specific findings" other than an increase in Plaintiff's blood pressure for which Effexor was prescribed. (R. 236.)

Plaintiff's first visit to the ACORN Clinic's psychiatric nurse practitioner, Anna B. Schwait, ARNP, took place on February 1, 2007. (R. 251-55.) Plaintiff reported that

7

she was suffering from reduced energy levels, that she was withdrawing from friends, and that she had difficulty sleeping. (R. 251.) Plaintiff did note, however, that she was beginning to see progress from the recently-started Effexor, which she reported was helping her feel better and not causing her any side effects, sleeplessness or agitation. (R. 251.) She also stated "'at least I'm not crying daily'" as she previously had been before she started taking Effexor. (R. 251.) The progress notes from that visit reflect that Plaintiff was calm and in no apparent distress; that she was friendly and cooperative; that she was alert and attentive; that her concentration and attention were focused; that her thought process was clear, logical and coherent; but that her affect was constricted. (R. 254.) Ms. Schwait again prescribed Effexor for Plaintiff and noted a diagnosis of "major depression, single episode." (R. 255.)

On a February 14, 2007 visit progress notes reflect that Plaintiff reported feeling less depressed and crying less since she had started taking Effexor. (R. 234.) On March 1, 2007 Plaintiff reported to Ms. Schwait that she had "'an emotional day'" and that she had not been very good at taking Effexor regularly or on a timely basis. (R. 250.) The progress notes for that visit note Ms. Schwait's impression that Plaintiff had a tearful but normal affect, alert and clear thoughts and included a diagnosis of major depression, single episode. (R. 250.) On May 17, 2007 Plaintiff reported that she felt more hopeful about life, that she was taking Effexor as directed, that it was helping her, and that she was glad she had come to the clinic for help. (R. 249.) Ms. Schwait's progress notes from that day disclose that Plaintiff appeared friendly, cooperative and normal in affect and that Plaintiff was alert and had clear thoughts. (R. 248.) On June 21, 2007 Ms. Schwait's progress notes reflect that Plaintiff continued to appear alert

8

and have clear thoughts and that she was friendly with normal affect. (R. 248.) On September 6, 2007 Plaintiff reported feeling more despondent; that she had been sleeping more during the day; that she was feeling stuck; that she had little energy or motivation; and that she increasingly had become worried about keeping up her mortgage payments. (R. 246.) In contrast, the progress notes from that visit reflect that Plaintiff had alert and clear thoughts; that Plaintiff reported having 2 lifelong friends as support and pets to keep her company, and that Plaintiff exhibited some tearfulness and feelings of hopelessness regarding her financial status. (R. 246.)

On November 29, 2007 Plaintiff reported that an increased dose of Effexor had "'really helped me stay calm and make it through all of this" despite tight finances. Ms. Schwait's progress notes reflect that Plaintiff was alert and oriented and that she had friendly and normal affect as well as clear and coherent thoughts. (R. 244.) Plaintiff's depression had improved enough that Ms. Schwait remarked on that date that Plaintiff's depression was in "early remission." (R. 244.) On December 13, 2007 the progress notes reflect that Plaintiff again self-reported that Effexor and counseling had improved her depression. (R. 229.) On January 29, 2008 Plaintiff reported that, although her best friend had recently been involved in a motorcycle accident, she was coping well and that she was better able to take care of herself. (R. 243.) Ms. Schwait's progress notes from that date reflect that Plaintiff was friendly and smiling with normal affect and again noted that Plaintiff's depression was in early remission. (R. 243.)

On April 3, 2008 Plaintiff reported that she had not been taking Effexor for approximately three weeks because she had been busy taking care of her former boyfriend after his motorcycle accident. (R. 226.) On April 29, 2008 Plaintiff denied

9

symptoms of depression or difficulty sleeping and reported that she felt good about her role as caretaker to her former boyfriend. Plaintiff reported that she maintained contact with her friends, which led Ms. Schwait to again note that Plaintiff's depression was in early remission. (R. 241.) During Plaintiff's next visit on June 19, 2008 she reported that she had not been taking Effexor for two weeks and was under a lot of stress but that she was "'less uptight" than she had been several months before. The progress notes reflect that Plaintiff appeared withdrawn, cried during part of the visit, and that Ms. Schwait encouraged Plaintiff to restart taking Effexor. (R. 225.) On June 23, 2008 Plaintiff reported that she had stopped taking Effexor for a period of two weeks and that she was experiencing increased weepiness such that she was crying 2-3 times per day and had difficulty falling asleep. (R. 239.) Ms. Schwait's progress notes from that visit reflect that Plaintiff wanted to stay on her medication and that Plaintiff reported being able to contrast how she felt while on the medication with how she felt when not on the medication. The progress note also reflects Ms. Schwait's diagnosis as major depression, recurrent. (R. 239-40.)

    C.    **<u>Hearing Testimony</u>**

At the administrative hearing Plaintiff testified that she lived with a close friend, who was also her former boyfriend. (R. 30.) The friend recently had suffered head trauma, loss of a leg and partial blindness as the result of a motorcycle accident in January 2008. Plaintiff testified that she drove her boyfriend to all of his doctor's appointments and acted as his caretaker. (R. 29-32.) Plaintiff testified that in that role her daily routine consisted of cleaning a little bit, doing some cooking, watching television and taking her friend back and forth to his doctor's appointments. (R. 29.)

She also testified that caring for her friend took approximately 30-32 hours per week and that her only source of income at the time of the hearing was the $700 per month that she received from her friend for taking care of him. (R. 25.)

Plaintiff testified that she had worked as a laborer at a car dealership from 1990 until stopping work in 2006. (R. 20.) For the three years prior to the hearing Plaintiff reported that she had acted as an on-call driver for various car companies. That job involved taking vehicles from one dealership to another, sometimes to dealerships as far away as Georgia or North Carolina. In that position she worked from 30 to 35 hours per week. (R. 21.) Prior to working at the auto dealership, Plaintiff worked at convenience stores and in the fast food industry. (R. 24.)

Plaintiff also testified that her depression had become worse over the two years prior to the hearing and had caused her to "throw away" her friends and family members. Plaintiff said she had given up hope and sometimes just wanted to lock herself in the house and not go anywhere. (R. 26.) Upon further questioning Plaintiff disclosed that occasionally she would lock herself in the house and not go anywhere for three or four days at a time. (R. 26.) She also reported crying much more often than she used to, and estimated that she cried every day. (R. 29.) Plaintiff also reported losing her concentration, misplacing bills and then being unable to find them when the bills came due. (R. 28.) Plaintiff recounted that normally she is easygoing and really friendly and that "'90 percent of the time I get along with people really good.'" Plaintiff advised that she always has had customer service type jobs in which she had to deal with people on a regular basis. (R. 28.) With regard to whether taking Effexor was beneficial for depression Plaintiff stated "I believe it's really helping me." Plaintiff

11

reported that she did not experience any side effects from taking the medication. (R. 29.)

### D. Findings of the ALJ

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of May 1, 2006. (R. 10.) He found at step 2 of the sequential evaluation that Plaintiff had the following severe impairments: back and leg pain. (R. 10.) The ALJ concluded, however, that Plaintiff's depression was not a severe impairment because: (i) the evidence demonstrated that Plaintiff suffered little to no limitations from depression in either her daily activities or social activities; (ii) the progress notes from the ACORN Clinic disclosed that Plaintiff's depression was in "partial remission," and (iii) Plaintiff had denied depressive symptoms both at the hearing and during many of her visits to the clinic. (R. 11.) After finding that Plaintiff suffered from severe impairments of back and leg pain, the ALJ found that the Plaintiff's severe impairments or combination of impairments did not meet or medically equal the Commissioner's Listings because the medical evidence did not support listing-level severity and no acceptable medical source mentioned findings equivalent in severity to the criteria of any listed impairment. (R. 11.) The ALJ further found that Plaintiff's testimony that her depression was a "disabling impairment" was not fully credible when compared to the results of physical examinations, progress notes from doctor's visits, Plaintiff's positive response to Effexor as well as her daily activities. (R. 13-14.) Specifically, with regard to depression, the ALJ found that Plaintiff is "[m]entally ... stable with her Effexor with no side effects." (R. 13-14.) The ALJ then concluded that Plaintiff has the residual functional capacity to perform the full range of light work. (R.

12.) After finding Plaintiff had the RFC to perform the full range of light work, the ALJ concluded that Plaintiff was capable of performing her past relevant work as a laborer at a car dealership and that this past relevant work did not require the performance of work-related activities precluded by the Plaintiff's residual functional capacity. (R. 14.) Accordingly, the ALJ concluded that Plaintiff had not been under a disability from May 1, 2006 through the date of the administrative hearing. (R. 14.)

## IV. Discussion

Plaintiff raises two issues on appeal, each of which is related. First, Plaintiff argues that the ALJ erred at step 2 of the sequential evaluation by not finding that Plaintiff's depression was a severe impairment. Second, Plaintiff argues that the ALJ erred by failing to consider Plaintiff's depression in combination with all of her other impairments. .

### A. The ALJ Properly Determined That Plaintiff's Depression Was Not A Severe Impairment

At Step 2 in the sequential evaluation, the ALJ found that Plaintiff's back and leg pain were severe impairments but that Plaintiff's depression was not severe. (R. 11.) The ALJ's conclusion that Plaintiff's depression was not severe is supported by the substantial evidence of record.

An impairment is severe at step 2 of the sequential evaluation if it significantly limits one's physical or mental ability to do basic work activities.[21] To be considered "severe" a medical condition must constitute more than a "deviation from purely

---

[21] 20 C.F.R. § 404.1520(c).

medical standards of bodily perfection or normality."[22]  Thus, a diagnosis of "depression" does not necessarily compel the conclusion that the condition is disabling.[23]  Although the threshold for meeting the definition of a "severe impairment" at Step 2 is low, the burden is, nonetheless, on the Plaintiff to provide evidence demonstrating the disabling impact of the depression.[24]

Contrary to Plaintiff's claim that the ALJ "ignored the competent substantial evidence regarding Plaintiff KUHL's major depression," the ALJ did in fact address Plaintiff's depression in his evaluation of the record evidence and went to considerable lengths to discuss and weigh that evidence in determining whether Plaintiff's depression constituted a severe impairment.  (R. 10-11.)

For example, the ALJ thoroughly reviewed the medical records from Plaintiff's visits to the ACORN Clinic between December 2006 and June 2008 and noted Plaintiff's self-reported symptoms of depression as reported in the progress notes. The ALJ found it was significant that Plaintiff had denied depressive symptoms on multiple visits to the ACORN Clinic and that the more recent progress notes evidenced that Plaintiff's depression was in partial remission.  (R. 11.)  The ALJ properly concluded that Plaintiff's depression did not constitute a severe impairment because the depression did not impose any severe limitations upon Plaintiff's activities of daily living, and only mildly affected her social limitations. Moreover, the ALJ relied upon the

---

[22] McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

[23] 20 C.F.R. §§ 404.1520(c), 416.920(c); see also Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[t]here must be a showing of related functional loss" for a psychological disorder to be considered disabling).

[24] Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

fact that the progress notes from Plaintiff's visits to the ACORN Clinic did not show any significant limitations with regard to Plaintiff's concentration, persistence or pace. (R. 11.)

In support of her argument that the ALJ erred, Plaintiff points to her testimony and to the August 28, 2008 Clinical Assessment of Pain form completed by Dr. Greenberg.

Dr. Greenberg's examination, however, supports the ALJ's assessment and not Plaintiff's position. In his report, in response to the questions: "Does the patient suffer from depression or anxiety related to his or her pain?" and "Is the patient being medicated for depression or anxiety?" – Dr. Greenberg checked the "No" box. ( R. 221.) Moreover, the report of Dr. Greenberg's examination of Plaintiff in 2006 did not include any notations whatsoever with respect to depression but focused solely upon Plaintiff's lumbar spine and lower back pain issues. (R. 171-74.) Thus, the notation in Dr. Greenberg's report that Plaintiff had marked restrictions concerned Dr. Greenberg's assessment of Plaintiff's restrictions resulting from chronic pain syndrome and not, as Plaintiff suggests, because of depression.

Moreover, because Plaintiff's statements regarding her depression were conflicting and contradictory, the ALJ did not err in rejecting Plaintiff's credibility with regard to the claimed severity of Plaintiff's depression. For example, while Plaintiff testified that she cried a lot, had short term memory problems and that sometimes she was afraid to be around people (R. 27-29), Plaintiff admitted that "90 percent of the time I get along with people really good" and further confirmed that taking Effexor was "really helping" and did not cause any side effects. (R. 28, 29.)

Plaintiff's testimony was also at odds with the progress notes from the ACORN Clinic, the only facility where Plaintiff received treatment for depression. During the approximately 18 months that Plaintiff was treated at the ACORN Clinic the majority of the progress notes from those visits show that Plaintiff's depression was being controlled adequately by medication and that her condition was even improving with treatment. (R. 229, 243, 244.) Where, as here, an impairment can be controlled adequately by medication it is less likely that the impairment is a "severe" impairment.[25] This can be seen in the progress notes in which Plaintiff reported her depression had worsened. In each of those instances (approximately four occasions) – where Plaintiff reported that her depression had worsened – the notes reflect that Plaintiff had discontinued taking Effexor. [26] (R. 225, 226, 239, 250.) Thus, the ALJ correctly found that Plaintiff's depression was not severe because taking Effexor adequately controlled the effect of her condition.

Indeed, while one of Ms. Schwait's progress notes contained a diagnosis of major depression, Ms. Schwait reported on at least three other visits that Plaintiff's major depression was in remission.[27] (R. 239-40, 241, 243.) Those progress notes recorded that Plaintiff was smiling, friendly, cooperative, alert, attentive, and that Plaintiff's concentration and attention were focused (R. 244, 246, 248, 250, 254), all of

---

[25] *See e.g.*, Brown v. Astrue, No. 07-14389, 2008 WL 2312398, at *4 (11th Cir. June 3, 2008) (ALJ did not err in accepting treating physician's opinion that plaintiff's condition had been stabilized by medication and concluding depression "non-severe").

[26] Those visits on which Plaintiff reported having stopped taking her medication were March 1, 2007, April 3, 2008, June 19, 2008, and June 23, 2008.

[27] The office visits in which the diagnosis reflected that Plaintiff's depression was in remission took place on November 29, 2007, January 29, 2008 and April 29, 2008.

16

which support the ALJ's conclusion that Plaintiff's depression did not prevent her from performing basic work activities.

Accordingly, the ALJ did not, as Plaintiff suggests, reject the diagnosis and mental assessments of the medical professionals who examined Plaintiff, but rather, thoroughly discussed and relied upon the progress notes and medical records recorded during Plaintiff's visit to the ACORN Clinic, in determining that Plaintiff's depression did not constitute a severe impairment at step 2. Therefore, the Court concludes that the there was no error in the ALJ's determination that Plaintiff's depression did not constitute a severe impairment at Step 2 and that this finding was supported by substantial evidence.

B.     **The ALJ Properly Considered Plaintiff's Impairments In Combination**

Plaintiff also argues that because the ALJ erred by failing to find Plaintiff's depression was severe the ALJ also committed further error by filing to consider Plaintiff's depression in combination with all of her impairments. According to Plaintiff, "[o]bviously the ALJ can't consider the effect of all of a claimant's impairments in combination when he has erroneously left one out of the mix."[28]

In determining the severity of impairments, the Commissioner must consider the combined effect and combined impact of all of the individual's impairments.[29] The ALJ expressly stated in his decision that he had given "particular consideration to the claimant's physical impairments and emotional impairments" in arriving at his

---

[28] Doc. 12

[29] 42 U.S.C. § 1382c(a)(3)(G).

17

conclusion that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (R. 11.)

In the Eleventh Circuit, a statement by the ALJ that he has considered the combined impairments is sufficient evidence that the ALJ considered the combined effects of Plaintiff's impairments.[30] The ALJ in this case, however, went further than merely reciting that he had given consideration to Plaintiff's depression. Instead, the ALJ specifically reviewed the objective medical evidence regarding Plaintiff's depression and concluded that Plaintiff's statements regarding the disabling nature of her depression were not fully credible because "[m]entally, she is stable with her Effexor with no side effects" and because her activities showed no significant limitations imposed by her depression. (R. 13-14.) Accordingly, the ALJ did not err in failing to consider Plaintiff's depression in combination with her other impairments.

## V. RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on December 13, 2010.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

---

[30] *See* Wilson v. Barnhart, 284 F.3d 1219, 1224-25 (11th Cir. 2002); Jones v. Dept. of Health and Human Servs., 941 F.2d 1529, 1533 (11th Cir. 1991).

## **NOTICE TO THE PARTIES**

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**